**AFFIRM; and Opinion Filed August 6, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-17-00988-CV**

**MICHAEL STIFF AND CHRISTINA GARZA INDIVIDUALLY, AND AS REPRESENTATIVES OF THE ESTATE OF NICHOLAS CHRISTOPHER GARZA, DECEASED; AND AS NEXT FRIEND OF D.A.G., N.Y.G., AND W.J.S., MINORS, AND PAULA LYLIA GARZA, AS LEGAL REPRESENTATIVE AND INDEPENDENT ADMINISTRATOR OF THE ESTATE OF NICHOLAS CHRISTOPHER GARZA, DECEASED Appellants**
**V.**
**KAUFMAN INDEPENDENT SCHOOL DISTRICT, MARION DEADMON, LEONARD DEADMON AND NATIONAL MENTOR HEALTHCARE, LLC D/B/A TEXAS MENTOR NETWORK, Appellees**

**On Appeal from the County Court At Law No. 1**
**Kaufman County, Texas**
**Trial Court Cause No. 86212-CC**

## MEMORANDUM OPINION
Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Francis

Seven-year-old Nicholas Christopher Garza got off a Kaufman ISD school bus and was

crossing the road to his foster parents' home when he was hit by a pickup truck and killed. His

parents, Michael Stiff and Christina Garza, individually, and on behalf of Nicholas's estate and as

next friends of his siblings, brought a negligence lawsuit against Kaufman ISD, Nicholas's foster

parents, and the foster agency that placed Nicholas.[1] The trial court granted appellees' motions

---

[1] Appellants also sued Salvador Hernandez, the driver of the pickup truck, but settled their claims against him.

for summary judgment and dismissed appellants' claims with prejudice. On appeal, appellants challenge the summary judgment on procedural and substantive grounds. For the reasons set out below, we conclude the issues are without merit and affirm the trial court's judgment.

Michael Stiff and Christina Garza are the parents of Nicholas and his three siblings, D.A.G., N.Y.G., and M.J.S. When Nicholas was born, he was addicted to cocaine and was placed in foster care for about eighteen months. When he was four or five years old, he was returned to foster care, again because of his mother's drug usage, but was returned to her about two weeks later. The last removal occurred in the summer of 2010 after Nicholas's mother spanked him, leaving "a mark" on his arm. Following that incident, Nicholas and his siblings were placed in a foster home with Marion and Leonard Deadmon; Texas Mentor Network was the agency that placed the children with the Deadmons.

The Deadmons enrolled the school-aged children—Nicholas and one of his brothers—in Kaufman ISD and registered both for school bus services. The Deadmons lived on State Highway 34 in Kaufman County and had lived there since 2004. The speed limit on the two-lane road is 55 mph, and the road has a sharp curve north of their home. In the mornings, the school bus picked up the boys, as well as the Deadmons' 10-year-old grandson and another foster child, from the Deadmons' driveway. But in the afternoons, the bus dropped the children off on the other side of the highway, requiring them to cross one lane of traffic. All of the children were under the age of ten.

On either January 5 or 6, 2011,[2] Nicholas and the other children rode the bus home from school. Once the driver reached the Deadmons' house, he stopped the bus in the northbound traffic lane with its red flashing lights and stop arm extended. The day was clear and sunny. As Nicholas was crossing the southbound lane, he was struck by a pickup truck driven by Salvador Hernandez.

---

[2] The record shows both dates as the date of the accident.

Nicholas died at the scene. Hernandez, who was vision-impaired, unlicensed, and driving at a "high rate of speed," said he did not see the bus or Nicholas until he was right on them. Hernandez subsequently pleaded guilty to criminally negligent homicide and was placed on deferred adjudication probation.

Nicholas's biological parents sued Hernandez, Kaufman ISD, the Deadmons, and Texas Mentor Network, alleging it was unreasonable for appellants to drop Nicholas off at a location where it was necessary to cross a highway that, in this case, had a curve in the road just before the accident site. They alleged the parties were negligent and grossly negligent.

The Deadmons and Texas Mentor Network (the "Deadmon appellees") together filed a combined traditional and no-evidence motion for summary judgment, asserting (1) they had parental immunity, (2) they did not have a duty to select the school drop-off location, and (3) there is no evidence they were the proximate cause of Nicholas's death and Hernandez was the sole proximate cause. Kaufman ISD filed a separate motion for summary judgment and alternative plea to the jurisdiction. The motion asserted immunity and causation grounds. Both sets of summary judgment motions attached evidence to be considered by the trial court, and appellants responded with evidence.

The summary judgment evidence showed in part the following: Michael Claussen was the driver of the school bus that day. He had been working in Kaufman ISD since 2009 and had been driving the route serving the Deadmons' home during that time. In the mornings, Claussen said his route allowed him to turn around and come back on Highway 34 to pick up the children on the Deadmons' side of the highway. But in the afternoons, he had student riders that lived on a country

road off of Highway 34, which did not allow him to "backtrack on Highway 34" as he did in the mornings.[3]

On the day of the accident, Claussen said he had made three previous stops so there was a line of traffic behind him on Highway 34. When he neared the Deadmons' stop, he activated his yellow lights early to alert the drivers behind him that he had more stops to make. As was his routine, Claussen said his head "was on a swivel" as he checked his mirrors and began the process of slowing down and developing a "safe zone" for the children who were getting off the bus. At that point, there was no oncoming traffic. As he came to a stop, he positioned the bus in the northbound lane of traffic so that the front of the bus was a little closer to the center line than the back of the bus, which gave him a better view of what was going on behind him. Claussen put the bus in neutral and opened the door, which activated the red lights and the stop arm. The four children walked to the front of the bus, and Claussen said he continued to look to see if there were cars coming. The students, including Nicholas, got off the bus and stood at its right front side and awaited Claussen's signal to cross. Claussen gave a "quick look" to the oldest child, the Deadmons' ten-year-old grandchild, to indicate they could begin crossing. At some point, either before or after the children got off the bus or after he gave the signal but before the children began to cross the southbound lane, Claussen saw an oncoming vehicle or vehicles.[4] Claussen said the vehicle slowed down but had not stopped. Nevertheless, he said he did not consider it a danger to the children about to cross the street. He checked in his mirror to monitor the northbound traffic

---

[3] Other evidence showed the route prepared before the school year began did not include the country road diversion and would have allowed Claussen to come back around and drop the children off on the same side of the highway. This would have required the children to stay on the bus for a longer period of time, but the entire route took about forty-five minutes to complete. The record did not establish who altered the route or when. After this accident, Claussen said the county road was taken off his route, and children were dropped off on the same side of the highway as their house. Kaufman ISD altered all bus routes so that student riders did not have to cross a highway or farm-to-market road.

[4] In his affidavit, Claussen testified he noticed the oncoming vehicle after he signaled the oldest child and after they "started walking across the front of the bus." In one portion of his deposition, he testified he saw a vehicle "had come to a - - practically a stop way far away from the driveway, like maybe the second driveway up. And I quick looked [at the oldest child], because he had already gathered, and that was when the quick look came." In another portion of his deposition, he testified as he made his safety checks, the children start "filing off the bus" and "in the meantime," he saw "vehicles coming, and they're slowing down. Now I've got to make sure they get off the bus properly."

behind him. He also looked out of his window and saw an adult at the end of the Deadmons' driveway and was "kind of relieved." Then, "a flash, a reflection of something" caught his eye. Claussen had just enough time to realize it was a pickup truck "coming at a pretty good clip, a good rate of speed." The truck struck Nicholas. It all happened, he said, "in a matter of two or three seconds." Witnesses at the scene said the bus's red flashing lights were activated and the stop arm extended to alert drivers, but Hernandez hit Nicholas at "full speed."

Although the Kaufman ISD Bus Rider's Handbook required a note from a parent or guardian before allowing students to "cross a heavily traveled road that compromises the safety of children," Claussen said, that to his knowledge, he had no such note. But, he said, on many days an adult was in the driveway waiting on the children. Moreover, he said he did not believe any such note was needed because the drop-off site was not "a dangerous situation." He testified the road was rural and not heavily traveled.

Hernandez testified he did not see the school bus or Nicholas before his truck struck the child. Although Hernandez's doctor told him eighteen months before this accident that his vision was getting worse because of his diabetes, Hernandez did not wear glasses or contact lenses. Three weeks after the accident, appellant saw an eye doctor, who tested his vision at 20/70 in his right eye and 20/100 in his left eye. By the time he pleaded guilty to criminally negligent homicide in 2014, he was "nearly blind." Further, Hernandez did not have a driver's license at the time of the accident and did not remember when he last had a valid Texas driver's license.

The Deadmons, who had been attending a foster parent training class in Dallas, were sitting in traffic behind the bus when the accident occurred. No one was at their home waiting for the children. Mrs. Deadmon said the drop location, across the highway from her home, had been in place for many years. In fact, she testified that she complained to Patrick Cardoza, the district's transportation director, on three different occasions, beginning some years earlier when her

grandson, who was ten at the time of the accident, was in first grade. The last request was made after Nicholas and his younger brother, D.A.G., began riding the bus. She was fearful D.A.G. would run back out into the street and asked that the children be dropped off in the driveway. She said Cardoza told her that was "not the protocol." No change was made until after Nicholas's death.

Cardoza testified he had been director of transportation since 2008 and the Deadmons' drop-off site was in place at that time. He denied that Mrs. Deadmon ever asked that it be changed to the same side of the highway as her house and said, if she had, he would have "honored" that request. He also testified it was his "understanding" that the Deadmons requested the children be dropped off on the other side of the highway.[5] Like Claussen, Cardoza said he believed the drop-off location was a "safe drop" and it "never crossed his mind" to relocate the drop site to the other side of the highway. When asked about the district's policy of requiring a note from parents whose children are dropped off on "heavily traveled roads" that "compromise safety," he said he "deemed" the Deadmons' bus registration to satisfy the policy. He also acknowledged the district's "procedure" that an adult be waiting for any student pre-kindergarten to second grade before allowing the student to be dropped off; if no adult was waiting, the child was not to be dropped off and the driver was to call transportation services, which in turn would contact the parents. Because Nicholas was in first grade, the policy applied to him.

Cardoza also testified that although he is the director of transportation, he counts on parents to help him make sure he has safe drops. He also said he had evaluated the drop site here and

[5] Cardoza verified Kaufman ISD's answers to interrogatories. Interrogatory 12 asked about "[a]ll communications Kaufman ISD had with any third parties, including but not limited to Leonard and Marion Deadmon, regarding the location of the bus stop that was involved in the incident giving rise to this litigation." Subject to objections, Kaufman ISD responded, "Either Mr. or Mrs. Deadmon requested that the students residing at the residence be let off at said location." Cardoza said he received the information from Claussen. Appellants' counsel asked, "And Mr. Claussen told you that the reason I dropped the kids off on the other side of the highway is because that's what either Mr. or Mrs. Deadmon requested?" Cardoza responded, "Yes."

–6–

determined it was safe. Cardoza said state law authorizes school trustees to put in place a transportation system for school children and, in Kaufman ISD, he was the person that authorized the routes and drop-off locations. He agreed the statute did not delegate that responsibility to parents.

All of these witnesses agreed there was a "risk" to allowing young children to cross a 55 mph highway, although they did not necessarily believe this stop was "dangerous" in and of itself. But no one disputed it would be "safer" to let children off on the same side of the road as their house. In addition, appellants presented testimony from a witness who held licenses to provide foster care and to operate as a foster placement agency. The witness testified the Deadmons and Texas Mentor Network had a duty to protect Nicholas, which included a duty of "safe transportation," and breached this duty by either requiring or allowing Nicholas to cross the highway after exiting the school bus or by failing to take steps to ensure he did not have to do so. Appellants also presented testimony from a woman with several years of experience in school bus transportation who believed Claussen and Kaufman ISD were negligent.

The trial court considered the motions for summary judgment at different hearings. After reviewing the evidence, the trial court granted the Deadmon appellees' motion for summary judgment in its entirety and granted Kaufman ISD's motion for summary judgment on the bases of "lack of causation and its entitlement to governmental immunity as a matter of law." The trial court dismissed all of appellants' claims against appellees with prejudice.[6] This appeal followed.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

---

[6] In its judgment, the court noted it specifically did not rule on Kaufman ISD's plea to the jurisdiction.

When we review a traditional summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Durham v. Children's Med. Ctr. of Dallas*, 488 S.W.3d 485, 489 (Tex. App.—Dallas 2016, pet. denied). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Id*. Once the defendant produces sufficient evidence entitling it to summary judgment, the burden shifts to the plaintiff to present evidence that raises a fact issue. *Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).

In a no-evidence motion for summary judgment, the movant need only allege there is no evidence to support an essential element of a claim on which a nonmovant has the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Once that occurs, the burden shifts to the nonmovant to present evidence that raises a fact issue on the challenged elements. TEX. R. CIV. P. 166a(i); *Swan v. GR Fabrication, LLC*, No. 05-17-00827-CV, 2018 WL 1959486, at *1 (Tex. App.—Dallas Apr. 26, 2018, no pet.) (mem. op.). The nonmovant will defeat a no-evidence motion by presenting more than a scintilla of evidence to raise a genuine issue of material fact. *Swan*, 2018 WL 1959486, at *1. More than a scintilla of evidence exists when the evidence rises to a level that would enable fair-minded people to differ in their conclusions. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). When a trial court grants a summary judgment without specifying grounds on which it was granted, we affirm if any ground advanced in the motion is meritorious. *See Garza v. CTX Mortg. Co.,* 285 S.W.3d 919, 922–23 (Tex. App.—Dallas 2009, no pet.).

Before turning to the merits of the summary judgments, we begin with appellants' first issue complaining the trial court's ruling was improper because there was "contradictory and inconsistent" evidence from interested witnesses. Specifically, they contend the Deadmons

testified Kaufman ISD selected the bus drop, while the school district said the foster parents wanted the children dropped off at that location. To the extent this evidence is material to any issue we resolve, we will consider the evidence in the light most favorable to appellants as required on summary judgment.

FOSTER PARENTS/TEXAS MENTOR NETWORK

Among the grounds advanced by the Deadmon appellees in their motion for summary judgment was there is no evidence the care they provided was the proximate cause of Nicholas's death. In their third issue, appellants assert summary judgment was not proper on this ground. Specifically, they assert the Deadmon appellees are liable for making a decision "to have a seven year old child . . . exit a school bus and cross a highway where the speed limit is 55 m.p.h." They argue the Deadmon appellees participated in this decision and their actions were a proximate cause of Nicholas's death.

To prevail on a common law negligence claim, a plaintiff must plead and prove that the defendant's negligence was the proximate cause of the injury. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). To establish proximate cause, a plaintiff must prove foreseeability and cause in fact. *Id*. We begin with cause in fact.

The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W. 794, 799 (Tex. 2004); *Boys Club*, 907 S.W.2d at 475. Cause in fact is not shown if the defendant's negligence did no more than furnish a condition that made the injury possible. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799; *Boys Club*, 907 S.W.2d at 475. In other words, even if the injury would not have occurred but for the defendant's conduct, the connection between the defendant's negligence and the plaintiff's injury may be too attenuated or remote. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799.

–9–

Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Boys Club*, 907 S.W.2d at 478. The danger of injury is foreseeable if its general character might reasonably have been anticipated. *Id.* The question of foreseeability, and proximate cause generally, involves a practical inquiry, based on "common experience applied to human conduct." *Id.* (quoting *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980)). Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant should have anticipated that his conduct would bring about injury. *See id.* (citing RESTATEMENT (SECOND) OF TORTS § 435(2) (1965)). Conjecture, guess, and speculation are insufficient to prove cause in fact and foreseeability. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 122 (Tex. 2009).

Appellants first argue the Deadmons "concede[d]" cause in fact by testifying that if the bus had stopped on their side of the highway, Nicholas would not have been in the lane of traffic and the accident would not have happened. They also rely on similar testimony from Kaufman ISD employees Cardoza and Claussen as well as Hernandez, the driver of the pickup that hit Nicholas. We cannot agree.

Even if the injury would not have occurred but for the Deadmons' decision to allow Nicholas to cross the street after exiting the school bus, this decision had to be a "substantial factor" in bringing about Nicholas's death, and his mere presence in the road is insufficient. When an alleged tortious act merely results in a plaintiff's presence at a location, but entirely different conduct causes him injury at that location, the injury is too attenuated from the defendant's original conduct to constitute the cause in fact of that injury. *JIK Cayman Bay Exchange, LLC v. Medina*, No. 05-16-01176-CV, 2018 WL 2045068, at *4 (Tex. App.—Dallas May 2, 2018, no pet.) (mem. op.) (citing *IHS Cedars Treatment Ctr*, 143 S.W.3d at 799)). Here, considering the evidence in

the light most favorable to appellants, (1) the bus driver allowed the children to exit the bus and begin crossing the lane of traffic despite the fact he saw an oncoming vehicle or vehicles that had not come to a complete stop and (2) on this clear, dry day, an unlicensed and visually-compromised driver did not see either the "big yellow bus" stopped in the only other lane of traffic, with its red lights flashing and stop arm extended, or the child crossing the street. In their response to the motion for summary judgment, even appellants argued that "[i]f the bus driver had waited to fully open his door and/or kept the children on the bus for just a few seconds longer until Salvador's pickup stopped or passed the bus, this incident would not have occurred." Given the circumstances of this case, we conclude the Deadmons' decision to allow Nicholas to ride the bus, knowing that he would be required to cross a lane of traffic, did no more than furnish a condition that made the injury possible.

Similarly, we cannot conclude appellants have raised a fact issue on foreseeability. Appellants argue the following testimony "fulfills the foreseeability requirement": (1) Mrs. Deadmon testified she requested the school district on three occasions to change the drop site so that the children would not have to cross the highway and that it would be safer to drop the children off on her side of the highway; (2) both Mr. and Mrs. Deadmon testified allowing children to cross a 55-mph highway involved "risk," one of which was that the child might be hit by a car and suffer major or fatal injuries; and (3) Mr. Deadmon said dropping the kids off on a highway where they would have to cross is dangerous.

That Mrs. Deadmon requested a safer drop or that the Deadmons recognized there was a risk in crossing the roadway does not raise a fact issue on foreseeability. Foreseeability requires more than the mere fact that a child may be run over while crossing the road; there is some risk involved for any pedestrian crossing a roadway, whether that person is a child or an adult. The general danger the Deadmon appellees had to reasonably foresee was the danger of injury from

–11–

crossing the roadway once the bus was stopped in the opposite lane of traffic with its red lights and stop arm activated, signaling to all other drivers that schoolchildren were disembarking the bus and crossing the roadway. The undisputed evidence in the record showed this route and the drop-off location across from the Deadmons' home had been in place for many years, and, according to Mr. Deadmon, no accidents or near accidents had occurred before this incident. Cardoza testified the decision to put the drop on the opposite side of the highway was made by the prior transportation director, but Cardoza had examined the site and determined it was safe. Similarly, the bus driver believed the stop was safe. What made the stop unsafe here was Hernandez, an unlicensed, visually-impaired driver who did not see or heed the school bus's red lights flashing and stop arm, did not see or yield to the small child in the lane of traffic, and, traveling at a high rate of speed, struck the child without ever applying the brakes. That extraordinary criminal circumstance was foreseeable only if viewed in retrospect. *See Boys Club*, 907 S.W.2d at 478. The Deadmons could not foresee such a circumstance any more than they could have foreseen that the school bus driver would allow the children to exit the bus and to cross the road without first ensuring that all traffic had stopped.

We conclude appellants failed to present some evidence to establish the proximate cause of Nicholas's death was the conduct of the Deadmons. Because appellants do not make any separate analysis with the respect to Texas Mentor Network which had a position more remote than the Deadmons, we reach the same conclusion with it. Therefore, the trial court did not err in granting summary judgment on appellants' claims against the foster parents and the foster agency. We overrule the third issue. Our disposition of this issue makes it unnecessary to address appellants' second, fourth, fifth, and sixth issues.

In their seventh issue, appellants contend the trial court erred by granting Kaufman ISD's motion for summary judgment on the basis of governmental immunity.

School districts are immune from suit for all torts under the Texas Tort Claims Act except in suits involving the operation or use of motor vehicles.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.051 (West 2011); *Dallas County Schools v. Vallet*, No. 05-16-00385-CV, 2016 WL 7163824, at *2 (Tex. App.—Dallas Dec. 8, 2016, no pet.) (mem. op.).  Specifically, a school district is liable only for "property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:  (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle; and (B) the employee would be personally liable to the claimant according to Texas law. . . ."  *Id*. § 101.021(1)(A)–(B).  The TTCA does not define the terms "use" or "operation," so we apply their common ordinary meanings.  *Vallet*, 2016 WL 7163824, at *2; *Austin Indep. Sch. Dist. v. Gutierrez*, 54 S.W.3d 860, 863 (Tex. App.—Austin 2001, pet. denied).  "Operation" means "a doing or performing of practical work," and "use" means "to put or bring into action or service; to employ for or apply to a given purpose."  *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 543 (Tex. 2003).  The "arises from" language in the statute requires a nexus between the injury and the operation or use of the motor vehicle.  *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.3d 49, 51 (Tex. 1992).  This nexus requires more than mere involvement of the vehicle; rather, the operation or use of the vehicle must have actually caused the injury.  *Whitley*, 104 S.W.3d at 543.  The operation or use of a motor vehicle "does not cause the injury if it does no more than furnish the condition that makes the injury possible."  *Id*.

Below and on appeal, appellants generally argue Kaufman ISD was negligent in establishing a bus stop on a highway with a 55 mph speed limit, near a dangerous curve, and having

young children disembark and cross the roadway when the district could have had the bus continue on, turn around, and drop the children off on the safe side of the highway. They argue the bus driver was negligent by (1) opening the doors and allowing young children to exit the bus before oncoming traffic came to a halt, (2) allowing the children off the bus when no adult was at home to receive them, and (3) allowing the children to exit the bus and cross the roadway without a note from parents allowing them to. They also argue the bus driver should have been trained to honk the horn to alert Nicholas to danger. Finally, they contend there is some evidence that the bus driver did not activate his stop sign and flashing lights.

With respect to any complaint that Kaufman ISD was negligent in evaluating or planning the safety of bus stops when planning a bus route, such a complaint does not involve the use or operation of a motor vehicle. *See Luna v. Harlingen Consol. Indep. Sch. Dist.*, 821 S.W.2d 442, 443–44 (Tex. App.—Corpus Christi 1991, writ denied). In *Luna*, school children were waiting to be picked up by the school bus at the intersection of two roads when they were struck by a motor vehicle. *Id*. The children were waiting for the school bus by standing in the traffic lane of one of the roads because the road's soft shoulder did not allow them to wait a safe distance away. The parents sued the school district for negligence in the planning and layout of bus stop locations. *Id*. at 443. The Corpus Christi court concluded the summary judgment proof did not show that the use or operation of a motor vehicle by a district employee was the proximate cause of the injuries. *Id*. Similarly here, we conclude Kaufman ISD's decision-making process in planning the bus route along Highway 34—and specifically, the drop-off sites—does not involve the use or operation of a motor vehicle for which immunity would be waived.

Appellants also argue there was some evidence that Claussen did not activate the stop sign and flashing lights. We assume such a failure would fall within the limited waiver of immunity for injuries and damages arising from use of motor vehicles. *See Hitchcock v. Garvin*, 738 S.W.2d

–14–

34, 37 (Tex. App.—Dallas 1987, no pet.) (concluding failure to activate flashers or warning signals of school bus when children exiting constitutes "act or omission arising from the operation or use of motor driven vehicle" under statute). Appellants direct us to portions of Hernandez's deposition in which he testified (1) there was nothing from a "health standpoint" that interfered with his ability to reasonably operate his vehicle that day, (2) if he had seen the stop sign extending from the side of the school bus and the flashing lights, he would have tried to obey them, and (3) he did not see the stop sign or flashing lights. Appellants argue that indulging all reasonable inferences in their favor, this is some evidence the stop sign and flashing lights were not used. We cannot agree. This evidence shows only that Hernandez did not see the stop sign and flashing lights; it does not show they were not activated. Later in his deposition, Hernandez was asked about this testimony:

> [COUNSEL]: You testified earlier that when you were approaching the bus, that you did not see yourself the red lights flashing or the stop sign extended. Do you recall that testimony?

> [HERNANDEZ]: Yes. Like I told you. I didn't even see the bus.

> * * *

> [COUNSEL]: Is it your testimony - - and tell me this: Do you know - - as you sit here today, do you know whether the bus had its lights on and the stop sign extended from the bus just prior to the accident?

> * * *

> [HERNANDEZ]: No. Like I already told you, by the time I saw the - - the bus, I was already on it. I was already on top of it.

> * * *

> [COUNSEL]: Let me see - - here's what we're trying to figure out: I'm trying to figure out, because everything happened so fast, did you not see the lights and the stop sign, or is it your testimony there were no lights and stop sign on the bus?

> * * *

> [HERNANDEZ]: No. No. No. I'm not saying - - I'm not saying it didn't have them on. Maybe it had them on, and I didn't see them.

> * * *

–15–

[COUNSEL]: That's fair.

So as you sit here today, you don't know one way or the other yourself whether the bus had the lights on and the stop sign extended?

[HERNANDEZ]: No.

* * *

[COUNSEL]: If there were witnesses to the accident of other people who were in vehicles close to the bus who have said that the lights were flashing on the bus and the stop sign was extended, you have no reason to disagree with their opinions, true?

* * *

[HERNANDEZ]: No.

Thus, Hernandez testified that he did not see the bus at all, did not know whether the bus had its lights on and stop sign extended, and had no reason to disagree with others who said the lights and stop sign were on. Claussen and other witnesses at the scene testified the bus's warning lights and stop arm were activated. No witness testified to the contrary. We conclude there is no evidence in the record to support any claim that Kaufman ISD, through its bus driver, was negligent by failing to activate the warning lights and stop arm.

With respect to the remaining allegations, as part of its motion for summary judgment, Kaufman ISD argued it is immune from appellees' negligence claim because the complained-of acts do not arise from the operation or use of a motor vehicle, but relate to supervision or control of students. We agree with Kaufman ISD.

In *Vallet*, this Court examined whether an employee's act involved actual use or operation of a vehicle, rather than supervision of children, when applying the term "use" or "operation" in school bus cases. 2016 WL 7163824, at *3–4. As we explained, when a plaintiff's injuries arise from an employee's "affirmative action" actually using or operating a bus, the school district's immunity has been waived. 2016 WL 7163824, at *3; *Breckenridge Indep. Sch. Dist. v. Valdez*, 211 S.W.3d 402, 408 (Tex. App.—Eastland 2006, no pet.); *Elgin Indep. Sch. Dist. v. R.N.*, 191

S.W.3d 263, 272 (Tex. App.—Austin 2006, no pet.). If the employee's act involved supervision or control of a child, immunity has not been waived, even if the act took place on or near the motor vehicle. *Vallet*, 2016 WL 7163824, at *3; *Gutierrez*, 54 S.W.3d at 863. Specifically, passenger injuries attributable to a bus driver's decisions and actions whether and when passengers disembark the bus, and their safety in doing so, are considered supervisory in nature. 2016 WL 7163824, at *3; *R.N.*, 191 S.W.3d at 272.

In *Vallet*, the mother of a six-year-old student sued Dallas County Schools after its bus driver left the child alone on the side of a highway. The mother pleaded that DCS was negligent in operating the bus by opening and closing the doors, confining the child inside the bus during transport, and preventing him from exiting the bus at his elementary school. She also alleged DCS was negligent in opening the bus doors and "expelling the child" on the side of a busy highway and driving away. Had DCS not "forcefully transported" the child, the mother alleged he would have remained safely on school grounds. *Vallet*, 2016 WL 7163824, at *4.

We concluded the gist of Vallet's allegations was not the use or operation of the bus because the child was not injured by the opening or closing or the doors or by the manner in which he was transported. Rather, we said any injury arose from the decision to place him on the bus and expel him from the bus, and these acts involved the supervision and control of the child. *Id.* Additionally, we concluded the allegations did not show the required nexus between the operation of the school bus and the child's injuries. *Id.*

Similarly here, Nicholas was not injured by the opening of the school bus door; rather, his injuries arose, in part, from the bus driver's decision, once the children had exited the bus, to signal with a "quick glance" at the oldest child that it was safe to cross, even though an oncoming vehicle had not fully stopped. That decision related to the supervision or control of the child. *See e.g.,* *Vallet*, 2016 WL 7163824, at *4; *Dallas Area Rapid Transit*, 104 S.W.3d at 542–43 (DART bus

driver forced disabled passenger off bus after fight with second passenger and said he would return; in meantime, second passenger exited bus two blocks later and, with friends, attacked disabled passenger; court concluded passenger's injuries arose from failure to supervise public, not use of bus); *Austin Indep. Sch. Dist. v. Salinas*, No. 03-14-00209-CV, 2016 WL 1566707, at *6 (Tex. App.—Austin Apr. 14, 2016, no pet.) (mem. op.) (child with disability opened back exit door, triggering buzzer, then jumped out of moving school bus; court concluded allegations of bus driver's failure to use rear-view mirror correctly or respond to buzzer, applying gas pedal instead of brakes after buzzer sounded, and failing to drive attentively involved bus driver's failure to supervise and control child to prevent him from jumping out door and, further, references to certain parts of school bus did not alter nature of allegations); *King v. Manor Indep. Sch. Dist.*, No. 03-02-00473-CV, 2003 WL 21705382, at *4 (Tex. App.—Austin Jul. 24, 2003, no pet.) (mem. op.) (student hit by car after being dropped off by school bus that then left; court concluded bus driver's judgment about amount of time necessary to remain at bus stop and judgment about what actions children were going to take is matter of driver's supervision of children, not operation and use of motor vehicle); *Ransom v. Ctr. for Health Care Servs.*, 2 S.W.3d 643, 645 (Tex. App.—San Antonio 1999, pet. denied) (op. on mot. for reh'g en banc) (concluding immunity not waived where bus driver dropped off adult man with mental capacity of four-year-old across street from his home, and man hit by intoxicated driver while crossing street); *Goston v. Hutchison*, 853 S.W.2d 729, 731 (Tex. App.—Houston [1st Dist.] 1993, no writ) (concluding allegations involved supervision of students in case where school bus driver dropped off two students at nondesignated stop where they were picked up by friend and subsequently injured in accident); *Estate of Garza v. McAllen Indep. Sch. Dist.*, 613 S.W.2d 526, 528 (Tex. App.—Beaumont 1981, writ ref'd n.r.e.) (no waiver of immunity when student stabbed and killed by nonstudent while riding school bus; court concluded school district's failure to enforce regulations governing use of buses by nonstudent and

failing to control and discipline behavior of occupants did not relate to operation or use of motor vehicle). Further, the statute requires a nexus between the injury and the operation and use of the motor vehicle that shows more than mere involvement of the vehicle; the operation of the vehicle must have actually caused the injury. Here, at most, the evidence shows the use or operation of the school bus did no more than furnish the condition that made Nicholas's death possible.

In reaching this conclusion, we are unpersuaded the *Gutierrez* case mandates a different result. In *Gutierrez*, two children exited a school bus and had to cross the street to reach home. 54 S.W.3d at 861. While stopped, the driver honked to signal it was safe to cross the street. One child safely crossed; the other was hit by a car and died from her injuries. *Id*. The Austin court of appeals found the driver's affirmative act in honking the horn was an operation or use of the vehicle that may have contributed to the child's accident. *Id*. at 866–67. Whether honking the horn is an operation or use of the school bus or is supervision or control of bus riders in such a situation is an issue we need not decide, because unlike the bus driver in *Gutierrez,* the bus driver here did not use the horn or any part of the bus to signal to Nicholas or the other children that it was safe to cross.

Finally, with respect to the allegations that Kaufman ISD was negligent in failing to obtain a note or to have an adult monitor on the bus, neither allegation involves the operation or use of the school bus.

Because we conclude Kaufman ISD conclusively established its defense of immunity, the trial court did not err in granting its motion for summary judgment and dismissing appellants' claims against it. We overrule the appellants' seventh issue.

–19–

We affirm the trial court's judgment.


/Molly Francis/

MOLLY FRANCIS
JUSTICE


170988F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL STIFF AND CHRISTINA GARZA INDIVIDUALLY, AND AS REPRESENTATIVES OF THE ESTATE OF NICHOLAS CHRISTOPHER GARZA, DECEASED; AND AS NEXT FRIEND OF D.A.G., N.Y.G., AND W.J.S., MINORS, AND PAULA LYLIA GARZA, AS LEGAL REPRESENTATIVE AND INDEPENDENT ADMINISTRATOR OF THE ESTATE OF NICHOLAS CHRISTOPHER GARZA, DECEASED, Appellants

No. 05-17-00988-CV         V.

KAUFMAN INDEPENDENT SCHOOL DISTRICT, MARION DEADMON, LEONARD DEADMON AND NATIONAL MENTOR HEALTHCARE, LLC D/B/A TEXAS MENTOR NETWORK, Appellees

On Appeal from the County Court At Law No. 1, Kaufman County, Texas
Trial Court Cause No. 86212-CC.
Opinion delivered by Justice Francis; Justices Fillmore and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees KAUFMAN INDEPENDENT SCHOOL DISTRICT, MARION DEADMON, LEONARD DEADMON AND NATIONAL MENTOR HEALTHCARE, LLC D/B/A TEXAS MENTOR NETWORK recover their costs of this appeal from appellants MICHAEL STIFF AND CHRISTINA GARZA INDIVIDUALLY, AND AS REPRESENTATIVES OF THE ESTATE OF NICHOLAS CHRISTOPHER GARZA, DECEASED; AND AS NEXT FRIEND OF D.A.G., N.Y.G., AND W.J.S., MINORS, AND PAULA LYLIA GARZA, AS LEGAL REPRESENTATIVE AND INDEPENDENT

ADMINISTRATOR OF THE ESTATE OF NICHOLAS CHRISTOPHER GARZA, DECEASED.


Judgment entered this 6th day of August, 2018.